**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ARIEL GOMEZ, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| *Plaintiff*, | ) | |
| | ) | Case No. |
| *v.* | ) | |
| | ) | |
| REYNALDO GUEVARA, BERSCOTT | ) | |
| RUIZ, ALAN PERGANDE, EDWARD | ) | |
| MINGEY, ROBERT BIEBEL, UNKNOWN | ) | |
| EMPLOYEES OF THE CITY OF | ) | |
| CHICAGO, and the CITY OF CHICAGO, | ) | |
| Illinois, | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

## COMPLAINT

NOW COMES Plaintiff, ARIEL GOMEZ, by his attorneys LOEVY & LOEVY, and

complaining of Defendants REYNALDO GUEVARA, BERSCOTT RUIZ, ALAN

PERGANDE, EDWARD MINGEY, ROBERT BIEBEL, UNKNOWN EMPLOYEES OF THE

CITY OF CHICAGO, and the CITY OF CHICAGO, Illinois, states as follows:

### INTRODUCTION

1.      On Friday June 13, 1997, the Chicago Bulls defeated the Utah Jazz to win their

fifth N.B.A. championship. That same evening, as celebrations took place throughout the City, a

tragedy occurred: Concepcion Diaz was shot at the busy corner of Diversey and Cicero Avenues

on Chicago's northwest side.

2.      That tragedy was followed by another: Ariel Gomez was wrongfully convicted of

killing Mr. Diaz. Plaintiff was just 17 years old when he was arrested, prosecuted, and wrongly

convicted. As a result, he was wrongfully incarcerated for nearly two decades.

3.     Plaintiff did not commit the murder. Indeed, Plaintiff has always maintained his innocence, even when doing so exposed him to the risk of a longer prison sentence.

4.     None of the physical or forensic evidence recovered from the scene connected Plaintiff to the gun or the bullets that were used to kill Mr. Diaz. To the contrary, ballistics testing conducted on the bullet recovered from the victim's body showed that Plaintiff did not shoot Mr. Diaz.

5.     Moreover, Plaintiff had no criminal record, no history of violence, and was not affiliated with any street gang.

6.     Plaintiff's arrest, prosecution, and conviction were based on false evidence manufactured by notorious Chicago Police Detective Reynaldo Guevara and the other Defendants.

7.     Included among that evidence was an involuntary and false statement attributed to Plaintiff, which was concocted and coerced by Defendants based on an interrogation in which Plaintiff was subjected to horrendous physical brutality and psychologically abuse.

8.     Defendants also created false reports and other police records that purported to document what witnesses told them but that instead deliberately omitted the portions of what eyewitnesses told them that showed that Plaintiff had not committed the murder.

9.     In order to secure Plaintiff's wrongful prosecution and conviction, the Defendants also suppressed evidence that would have shown Plaintiff was innocent and revealed Defendants' misconduct, as well as evidence that could have been used to undermine the testimony of State's witnesses, including the testimony of Defendants themselves.

10.     The misconduct resulting in Plaintiff's wrongful conviction was part of a now well-known pattern of illegal activity perpetrated by Defendant Guevara and the other Defendants.

11.     Defendant Guevara and his supervisor, Defendant Mingey, have now refused to even answer questions about their police work instead invoking their Fifth Amendment right not to incriminate themselves about dozens of investigations, including their work in the investigation of the Diaz homicide for which Plaintiff was wrongfully convicted.

12.     In 2017, Cook County Judge James Obbish found that Defendant Guevara had told "bald face lies" during court testimony and had "eliminated any possibility of [] being considered a credible witness in any proceeding."

13.     Indeed, Plaintiff is one of eighteen men exonerated after being convicted on murder charges resulting from corrupt homicide investigations conducted by Defendant Guevara and his fellow Area 5 detectives and supervisors.

14.     More than 20 years after his nightmarish ordeal began, Plaintiff has finally been exonerated.

15.     Plaintiff now seeks justice for the harm that the Defendants have caused and redress for the loss of liberty and the terrible hardship that he has endured and continues to suffer as a result of the Defendants' misconduct.

## JURISDICTION AND VENUE

16.     This action is brought pursuant to 42 U.S.C. § 1983 and Illinois law to redress the Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the U.S. Constitution.

17.     This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims pursuant to 28 U.S.C. § 1367.

18.     Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district. The events and omissions giving rise to Plaintiff's claims occurred within this judicial district, including the investigation, prosecution, and trial resulting in Plaintiff's conviction. In addition, many if not all of the Defendants reside in this judicial district.

## PARTIES

19.     Plaintiff Ariel Gomez spent approximately 20 years wrongly incarcerated based on a conviction for a murder that he did not commit.

20.     At all times relevant to the events described in this Complaint, Defendants Reynaldo Guevara, Berscott Ruiz, and Alan Pegrande, and other unknown law enforcement officers were police officers in the Chicago Police Department.

21.     At all times relevant to the events described in this Complaint, Defendants Edward Mingey and Robert Biebel, and other unknown law enforcement officers supervised the officers in the preceding paragraph. These Defendants participated in the misconduct alleged in this Complaint and also facilitated, condoned, approved, and turned a blind eye to misconduct of the Defendants whom they supervised.

22.     The City of Chicago is an Illinois municipal corporation that is or was the employer of the above-named Defendants. Each of the Defendants named in this Complaint acted during their investigation of the Diaz murder as agents or employees of the City of Chicago. The City of Chicago is liable for all torts committed by the Defendants pursuant to the doctrine of *respondeat superior*. Additionally, the City of Chicago is additionally responsible for the policies and practices of the Chicago Police Department.

23.     Each and every individual Defendant, known and unknown, acted under color of law and within the scope of his or her employment at all times relevant to this lawsuit. Each of the individual Defendants is sued in his or her individual capacity unless otherwise noted.

## FACTS

### The Crime

24.     On June 13, 1997, seventeen-year-old Ariel Gomez went out with some friends as celebrations of the Chicago Bulls' fifth National Basketball Association Championship were happening throughout the city. It was also the day of the Puerto Rican Day parade, and so many people on the Westside of Chicago were already out that evening.

25.     Plaintiff and four other teenagers—Jose Dominguez, Paul Yalda, John Yacoub, and Dragon Jovanovich—decided to drive around in a 1995 Red Nissan Pathfinder belonging to Gomez's mother.

26.     After driving for a period of time, the teens stopped and Jose Dominguez fired one shot from Plaintiff's gun into the air to celebrate the Bulls' victory. The gun was a chrome plated .45 caliber Ruger handgun. The group got back into the car and discussed the fact that there was then only one bullet left in the gun.

27.     The teens eventually drove southbound on Cicero Avenue towards the intersection of Cicero and Diversey. At that time, parking lots were located at three of the four corners of that intersection.

28.     Crowds of individuals gathered in the parking lots, and on the streets surrounding the intersection, in the wake of the Bulls' championship and the Puerto Rican Day festivities.

29.     The Pathfinder approached the intersection of Cicero and Diversey and stopped at the light. At the time, two of the teens in Gomez's car were on top of the vehicle. Several people

at the intersection flashed gang signs at the teens, and threw bricks at the Pathfinder, breaking the windows and hitting one of the teens in the head.

30.     Plaintiff and the other teens in the car were not gang members and did not know the men who had thrown bricks at the car.

31.     The teens hurried out of the intersection going southbound and turned right onto a side street, and when that was blocked turned right again into an alley, facing north, which took them back into the intersection going north.

32.     When they went back into the intersection Plaintiff got up on the front passenger seat and hung out the front passenger window, holding the gun above his head with the muzzle pointing upward. He fired a single shot into the sky, intending to disperse the crowd so that the teens could make their way out of the intersection and away from the crowds.

33.     After turning north in the southbound lane and then veering off the road entirely and cutting through parking lots, Plaintiff and the other teens were able to get away from the intersection.

34.     The single bullet Plaintiff fired into the air was the only one in his gun.

35.     Almost immediately after Gomez fired into the air, several more gunshots were fired by someone in the parking lot.

36.     At least two of those shots struck and killed a man waiting for the bus, Concepcion Diaz.

37.     Diaz was shot twice. Autopsy evidence concerning the trajectory of the bullets indicated that the shots were fired by someone at ground level.

### The Ensuing Police Investigation

38.     Police officers arrived on the scene less than 10 minutes after the shooting. Detective Guevara arrives moments later.

39.     There, officers recovered evidence from the crime scene, which included a single .45 caliber bullet shell and pictures of the scene as it appeared at the time.

40.     Though dozens of people were on the scene when the events took place, only a handful of witnesses were listed in police records.

41.     Numerous witnesses reported hearing multiple gun shots at the busy scene.

42.     That night, the police obtained the license plate number of the Pathfinder from a witness at the scene, linking the car to the Gomez residence.

43.     Over the course of that night, Gomez and the others teens in the Pathfinder were located by CPD officials and arrested.

44.     Plaintiff truthfully told detectives that the gun he had at the intersection was at his mother's house. Detective Guevara requested that officers from the technical forensics division go to Gomez's mother's house to search for the weapon.

45.     Two CPD forensic investigators went to Gomez's mother's house and recovered the .45 Ruger from on top of a living room cabinet of the house. The examiners took photographs, and in their reports documented that the .45 Ruger recovered did not have a magazine (that is, a "gun clip"), and that no ammunition was found with the gun.

46.     The CPD did not need to get a warrant to search the house for the gun; instead they were allowed to search the home consensually.

47.     Ballistics testing was conducted, which involved comparing Plaintiff's Ruger handgun to the .45 caliber bullet recovered from Mr. Diaz's body.

48.     The testing revealed that Plaintiff's Ruger did not and could not have fired the bullet that killed Mr. Diaz.

**Defendants' Abusive Interrogation of Ariel Gomez**

49.     Upon Plaintiff's arrest, he was placed in an interrogation room and handcuffed to the wall.

50.     Defendants' interrogation of Plaintiff began in the early morning hours of June 14, 1997, and continued overnight and into the early afternoon the next day. It was an extreme and alarming abuse of police power. It was a wholly illegal effort to secure a false confession from Plaintiff in violation of his constitutional rights, by means of physical violence and psychological abuse and coercion.

51.     Plaintiff was just 17 years old. He was in a setting and circumstances that were completely foreign to him. He was deprived of sleep and food. He was isolated and disoriented.

52.     Defendants took no steps to limit or to adapt their questioning of Plaintiff in response to these known vulnerabilities.

53.     Instead, they did the opposite: they agreed among themselves and acted to exploit Plaintiff's vulnerabilities to secure a confession, regardless of whether it was true or false, knowing that there was obvious evidence to suggest that Plaintiff was not responsible for the murder.

54.     Indeed, multiple officers participated in the interrogation. And at various points during Plaintiff's interrogation, including when the officers had the door to the interrogation room open, Plaintiff could tell that the Defendants were standing outside the interrogation room talking to each other about Plaintiff.

55.     In the course of the interrogation, Defendants pressured Plaintiff to falsely confess to killing Concepcion Diaz. When Plaintiff refused, Defendants abused him.

56.     It started with Defendant Guevara placing Plaintiff in the interrogation room, grabbing him around the neck and screaming at Plaintiff that he killed Mr. Diaz.

57.     Over the course of the night, Defendant Guevara punched Plaintiff numerous times, including in the stomach, back, arms and shoulders.

58.     In one instance, when Plaintiff again refused to incriminate himself in the crime Defendant Guevara punched Plaintiff in the face, causing him to bleed.

59.     The supervisor Defendants were aware of the physical abuse. One of them came into the interrogation room in which Plaintiff was being held and instructed the Defendants to wipe the blood off of Plaintiff's face before he was taken out of the room.

60.     The physical beating was so severe that one side of Plaintiff's body was covered in bruises, and he cried out in pain.

61.     Defendants were also psychologically abusive. Plaintiff feared for his life; he grew afraid that Defendants were going to kill him. Plaintiff broke down crying, experiencing a combination of fear, helplessness and hopelessness.

62.     During the interrogation, Defendants never gave Plaintiff *Miranda* warnings.

63.     In their interrogation, Defendants took no steps to account for the fact that Plaintiff was a juvenile and had no criminal record, even though they knew this to be the case.

64.     In the end, Plaintiff was truthful about firing a single shot into the air, and he never confessed to shooting Mr. Diaz despite the intense physical and psychological abuse exerted upon a 17-year-old.

65. However, Defendants fabricated a statement that falsely implicated Plaintiff in the crime. Defendants knew that the things they included in the statement were false and were not things Plaintiff had told them during the interrogation.

66. Nonetheless, through coercion and without giving him the opportunity to read the statement, Defendants attributed the false statement to Plaintiff—a false "confession" to the crime.

67. The statement was used against Plaintiff throughout the criminal proceedings to secure his conviction.

**Defendants Try To Fabricate Eyewitness Identifications To Implicate Plaintiff And Suppress Evidence of Lineups In Which Witnesses Could Not Identify Plaintiff**

68. While Defendants were trying to obtain a false confession from Plaintiff through the use of abusive tactics, discussed above, at the same time they tried to pressure witnesses into giving false statements and into making false identifications of Plaintiff as the person who shot Mr. Diaz.

69. Defendants brought witnesses from the crime scene to the police station and had them look into the interrogation room where Gomez was sitting. They could see in through a narrow glass window in the door to the interrogation room. Defendants kept that window covered with cardboard during much of the time Plaintiff was in the interrogation room, but lifted the cardboard at various times so that witnesses could look into the room and observe Plaintiff.

70. Plaintiff watched this happen numerous times, with numerous witnesses. He could see the Defendants pointing into the room and directing the witnesses to look at Plaintiff.

71. Defendants told the witnesses that Plaintiff was the person that shot Mr. Diaz, and pressured the witnesses to say that Plaintiff was the shooter.

72.     Witnesses from the crime scene that Defendants tried to get to identify Plaintiff included Ruth Antonetty, Debbie Daniels and Maria Castro, among others.

73.     In addition, Defendants placed Plaintiff in multiple lineups in which he was a suspect. Plaintiff was not selected by the witnesses viewing those lineups.

74.     Defendants hid from Plaintiff all evidence of those lineups having occurred.

**Defendants Suppress Evidence of the Real Shooter and Fabricate Police Reports**

75.     Multiple eyewitnesses from the crime scene told Defendants that the single shot Plaintiff fired toward the sky did not kill Mr. Diaz, and that instead the shots that killed Mr. Diaz came from a different shooter in the parking lot.

76.     Ruth Antonetty, for example, was at the scene of the crime when the shooting occurred. She told the Defendants that Plaintiff did not fire the shots that killed Mr. Diaz. She also told the Defendants that some time before the shooting she saw a member of the Latin Brothers street gang retrieve a gun and then fire 2-3 shots from a parking lot that hit Mr. Diaz.

77.     Ms. Antonetty also told Defendants that she believed she could identify the Latin Brother gang member who shot Mr. Diaz.

78.     Rather than pursue this important lead, Defendants threatened Ms. Antonetty and pressured her to falsely identify Plaintiff.

79.     Similarly, another witness told officers that she heard several shots that did not come from Plaintiff's car, and that those shots were fired as Plaintiff's Pathfinder was already leaving the intersection.

80.     Defendants hid all of this powerful evidence of Plaintiff's innocence—and of someone else's responsibility for the tragic death of Mr. Diaz—from Plaintiff and his defense attorneys.

81.     Defendants also fabricated police reports related to their interviews of Ms. Antonetty and other witnesses from the scene. Those reports deliberately and falsely reported what the witnesses had told them in order to frame Plaintiff for the murder and ensure his wrongful conviction.

82.     The false police reports described above were approved by Defendants Mingey and Biebel.

### Additional Steps to Frame Plaintiff

83.     Independent of Defendants' misconduct discussed above, the Defendants took additional steps to frame Plaintiff.

84.     Defendants deliberately withheld evidence that further demonstrated Plaintiff's innocence.

85.     Among other things, Defendants withheld their general progress reports and other notes indicating that witnesses gave statements favorable to Plaintiff.

86.     Moreover, the Defendants destroyed exculpatory evidence that could have been used to demonstrate Plaintiff's innocence. Among other things, Defendants destroyed the gun clip recovered from the crime scene, knowing that testing on that item would support Plaintiff's version of events and his innocence.

87.     To cover up for the destruction of evidence, Defendants prepared false police reports about what evidence they recovered, where it was recovered from and who recovered it.

88.     The false police reports were used to cover up evidence of Defendants' misconduct.

89.     At all times, Defendants suppressed their misconduct. They did not disclose their misconduct to Plaintiff or his attorneys at any time.

90.     These additional acts of misconduct, including the destruction of evidence and preparation of false police reports, were approved by Defendants Mingey and Biebel.

91.     In addition, on information and belief, the Defendants suppressed and destroyed additional evidence still unknown to Plaintiff, which would also have proven Plaintiff's innocence.

**Policy and Practice of Wrongly Convicting Innocence Persons In Violation of Due Process**

92.     The Chicago Police Department is responsible by virtue of its official policies for scores of miscarriages of justice like that inflicted upon Plaintiff.

93.     Since 1986, no fewer than 70 cases have come to light in which Chicago police officers have fabricated false evidence or have suppressed exculpatory evidence in order to cause the convictions of innocent persons for serious crimes they not commit.

94.     These cases include many in which Chicago police officers used the same tactics that Defendants employed against Plaintiff in this case, including: (1) using physically and psychologically coercive tactics to obtain involuntary and false inculpatory statements; (2) fabricating witness statements; (3) fabricating witness identifications; (4) concealing exculpatory evidence; (5) manipulating witnesses in order to influence their testimony; and (6) using other tactics to secure the arrest, prosecution and conviction of a person without probable cause and without regard to the person's actual guilt or innocence.

95.     At all relevant times, members of the Chicago Police Department, including the Defendants in this action, routinely manufactured evidence against innocent persons by coercing, manipulating, threatening, pressuring, and offering inducements to suspects and witnesses to obtain false statements implicating innocent persons, knowing full well that those statements were false. As a matter of widespread custom and practice, members of the Chicago Police

13

Department, including the Defendants in this action, contrived false witness narratives that were fed to vulnerable witnesses, who then adopted those false witness narratives as their own for the purpose of wrongly convicting an innocent person. In addition, Chicago Police Department Offices routinely fabricated and manipulated identification procedures to procure identifications of individuals that they knew to be inaccurate. Furthermore, Chicago Police Department officers systematically suppressed exculpatory and/or impeaching material by concealing evidence that a witness was coerced, manipulated, threatened, pressured or offered inducements to make false statements.

96.     The municipal policy and practice described in the paragraphs above was recently described in a Federal Bureau of Investigation FD-302 Report of an interview with Assistant State's Attorney Terence Johnson. The Report documents, *inter alia*, that Chicago police detectives would feed information to witnesses and coach them through court-reported and handwritten statements, coerce witnesses into sticking to a detective's theory of the case, physically abuse witnesses, and work together to develop and rehearse false narratives so there were no inconsistencies in the witnesses' stories.

97.     At all times relevant hereto, members of the Chicago Police Department, including the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos and other information in files that were maintained solely at the police department and were not disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed or hidden at the close of the investigation, rather than being maintained as part of the official file.

98.     Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, concealed exculpatory evidence from Plaintiff.

99.     The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established and corroborated in the cases of, *inter alia*, *Fields v. City of Chicago*, 10 C1168 (N.D. Ill.), and *Jones v. City of Chicago*, 87 C 2536, 88 Civ. 1127 (N.D. Ill.).

100.    The policies and practices of file suppression at issue in *Fields* applied throughout the timeframe from the 1980s through the 2000s, including at the time of the Diaz murder and investigation at issue here.

101.    In addition, a set of clandestine street files related to Area 5 homicides—the same Detective Division involved in this case—was found in the case of *Rivera v. City of Chicago*, 12 Civ. 4428 (N.D. Ill.).Those files, for a period in the 1980s and 1990s, contained exculpatory and impeaching evidence not turned over to criminal defendants.

102.    The policy and practice of suppressing exculpatory and/or impeaching material evidence was alive and well at the time of the investigation into the Diaz murder, including in the Area 5 Detective Division.

103.    The City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago Police Detectives recommended charging an innocent person with a serious crime, and no Chicago Police Officer has ever been disciplined as a result of his misconduct in any of those cases.

104.    Prior to and during the period in which Plaintiff was falsely charged and convicted with the Diaz murder, the City of Chicago also operated a dysfunctional disciplinary

system for Chicago Police Officers accused of serious misconduct. The City almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. The Chicago Police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

105.    As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence with the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

106.    As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct and facilitating a code of silence within the Chicago Police Department, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

107.    This includes Defendants in this case. By way of example, Defendant Guevara has a long history of engaging in the kind of investigative misconduct that occurred in this case, including coercing confessions, manipulating witnesses, fabricating evidence, and concealing evidence in the course of maliciously prosecuting innocent persons. There are dozens of known cases in which Guevara has engaged in serious investigative misconduct, including many cases

in which they have obtained false identifications, manipulated and coerced suspects and witnesses, and fabricated and concealed evidence, as they did in this case. They engaged in such misconduct because they had no reason to fear that the City of Chicago and its Police Department would ever discipline them for doing so.

108.    The City of Chicago and the Chicago Police Department also failed in the years prior to Plaintiff's wrongful charging and conviction to provide adequate training to Chicago Police Detectives and other officers in any of the following areas, among others:

a.    The conduct of live and photographic lineup procedures.

b.    The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding.

c.    The need to refrain from physical and psychological abuse, and manipulative and coercive conduct, in relation to suspects and witnesses.

d.    The risks of wrongful conviction and the steps police officers should take to minimize risks.

e.    The risks of engaging in tunnel vision during investigation.

f.    The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

109.    The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago Police Officers as alleged in the preceding paragraph caused Plaintiff's wrongful conviction and his injuries.

110. The City's failure to train, supervise, and discipline its officers, including Defendants Guevara and other Defendants, condones, ratifies, and sanctions the kind of misconduct that the Defendants committed against Plaintiff in this case. Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and *de facto* polices, as alleged above.

111. The City of Chicago and final policymaking officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

112. The policies and practices described in the foregoing paragraphs were also approved by the City of Chicago policymakers, who were deliberately indifferent to the violations of constitutional rights described herein.

**Defendant Guevara's History of Framing Innocent Persons**

113. As a result of the policies and practices of the Chicago Police Department, described above, Defendant Guevara has framed dozens of other innocent men over the span of two decades. Like Plaintiff, these men have all lodged independent accusations of similar misconduct against him.

114. As of the filing of this complaint, 18 men have had their convictions thrown out as a result of Defendant Guevara's misconduct. Those men served hundreds of years in prison for crimes they did not commit. In addition to Plaintiff, the other seventeen men are Jacques Rivera, Juan Johnson, Jose Montanez, Armando Serrano, Jorge Pacheco, Roberto Almodovar, William Negron, Jose Maysonet, Angel Rodriguez, Santos Flores, Henry Johnson, Arturo

DeLeon Reyes, Gabriel Solache, Ariel Gomez, Xavier Arcos, Ricardo Rodriguez, and Robert Bouto.

115.    Defendant Guevara has a long history of engaging in precisely the kind of investigative misconduct that occurred in this case, including obtaining false eyewitness identifications through manipulated identification procedures, and using abusive tactics, manipulation of witnesses, fabrication of evidence, and concealment of evidence in the course of maliciously prosecuting innocent persons. In addition to the cases in which individuals have been exonerated, there are dozens of other identified cases in which Defendant Guevara has engaged in serious investigative misconduct.

116.    Given this extensive history of misconduct and the City of Chicago's failure to meaningful disciplined Guevara and others, it is apparent that Guevara engaged in such misconduct because he had every reason to believe that the City of Chicago and its Police Department condoned his conduct.

117.    Repeatedly, Defendants Guevara has also invoked his Fifth Amendment right not to answer any questions about allegations that he manipulated dozens of witnesses to provide false identifications because truthful responses could subject him to criminal liability, including every single instance of misconduct detailed below.

118.    Examples of Defendant Guevara's misconduct include:

a.    Bill Dorsch is a former Chicago police detective. While serving with the Chicago police department, Dorsch was assigned to investigate a murder. Several months after the murder occurred, Defendant Guevara brought two juveniles to the police station that purported to have witnessed a shooting and recorded the license place of the shooter. Based on the information provided, Detective Dorsch created a photo array for the juveniles to attempt to identify the

shooter. While the first juvenile was viewing the photo array, and before he identified any of the photographs, Defendant Guevara pointed to the suspect's photo and told the juvenile "that's him." The juvenile then agreed with Guevara, saying that was the person who committed the shooting. Dorsch then directed Defendant Guevara to leave the room and had the other juvenile view the same photo array, and he was unable to make any identification. Based on the first juvenile's identification, the suspect was charged with murder. Subsequently, Dorsch spoke to the two juveniles without Defendant Guevara being present. The juveniles admitted that they had been paid to falsely claim that the suspect was the person responsible for the shooting. After prosecutors spoke to the two juveniles, the suspect was released.

b. Defendant Guevara's activities have drawn the interest of federal law enforcement officers. In 2001, the FBI authored a special report detailing the criminal activity of Chicago Police Officer Joseph Miedzianowski and his associates, including Defendant Guevara. The report details that Defendant Guevara, while acting in his capacity as a police officer, would apprehend drug and gun dealers and then allow them to "buy their way of trouble." According to the report, Guevara also took bribes to alter both positive and negative lineups of murder suspects. Finally, the report states that Guevara, using an attorney as a conduit, would receive cash in exchange for the ultimate dismissal of murder cases he investigated.

c. In 1989, Defendant Guevara coerced Samuel Perez into falsely identifying Juan Johnson as the person who killed Ricardo Fernandez. Defendant Guevara put Perez inside his car, showed Perez a photo of Juan Johnson, and told Perez that he wanted Juan Johnson to take the blame for the murder. Unsurprisingly, Perez subsequently falsely identified Johnson as a murderer.

d.   In 1989, Defendant Guevara also coerced Salvador Ortiz into making a false identification of Juan Johnson, which he later recanted.

e.   Juan Johnson was later exonerated and brought suit against Defendant Guevara. A federal jury found that Guevara framed Johnson for murder and awarded Johnson $21 million in damages.

f.   In 1989, Defendant Guevara coerced Virgilio Muniz into making a false identification by repeatedly threatening Muniz that if he did not identify Manuel Rivera as the murderer, Muniz would "go down for the murder."

g.   In 1989, Defendant Guevara coerced Virgilio Calderon Muniz (unrelated to Virgilio Muniz, described in the above paragraph) into making a false identification by telling him who to identify and making a veiled threat as to what would happen if he did not.

h.   In 1991, Defendant Guevara coerced Wilfredo Rosario into making a false identification and giving false testimony before the Grand Jury by threatening Rosario that if he did not identify Xavier Arcos as the murderer, Rosario would be "pinned" for the murder. Guevara fed Rosario details of the crime, such as the number of shots fired, the type of vehicle used in the crime, and the participants in the crime. Rosario recanted his identification of Arcos at trial. Though Arcos was still found guilty of murder by a jury, the appellate court overturned the conviction based on the lack of sufficient evidence.

i.   In 1991, Defendant Guevara physically coerced sixteen year-old David Velazquez into making a false identification and giving false testimony by taking him to a rival gang's territory, beating him while chained to a wall at Area 5, and threatening to "get you for anything I can" if he did not talk. All of the false details of Velazquez's statement were provided by Guevara.

21

j.   In 1993, Defendant Guevara coerced an identification from Carl Richmond by threatening Richmond that he could make his life very uncomfortable if Richmond did not identify Robert Bouto as the murderer of one of Richmond's friends. Richmond, who was familiar with Guevara's tactics, believed that Guevara would honor this threat.

k.   In 1995, Defendant Guevara arrested Edwin Davila and, in an attempt to coerce a confession, chained him to the wall of an interrogation room and told him that he was going to frame him for murder.  After Davila told Guevara that he did not do it, Guevara forced Davila to participate in a lineup in which two witnesses identified Davila as the perpetrator, despite the fact that each of those witnesses had previously told the police that they had not been able to see the shooter.

l.   In 1991, Defendant Guevara told Efrain and Julio Sanchez to pick David Colon out of a lineup. As a result, these men falsely claimed that Colon had committed murder, but later came forward to bring Defendant Guevara's misconduct to light.

m.   In 1995, Defendant Guevara coerced Evelyn Diaz into making a false identification and providing false testimony to the Grand Jury by threatening Diaz that if she did not identify Luis Serrano as the shooter, her children would be taken away by the Department of Children and Family Services.

n.   In 1995, Defendant Guevara told Luis Figueroa to falsely identify Angel Diaz as the perpetrator even though Figueroa did not see anything. Figueroa identified Diaz but recanted his identification at trial.

o.   In 1995, Defendant Guevara coerced Gloria Ortiz Bordoy into making a false statement and testifying falsely against Santos Flores at trial. During Ortiz Bordoy's six-to-eight hour interrogation, Guevara yelled in her face, threatened that her children would be taken by the

Department of Children and Family Services, called her "the B word," and "raised his hand" saying that he "felt like smacking" her. Finally, without reading its contents, Ortiz Bordoy signed a statement that the detectives wrote out for her because she just wanted to "get out of there."

p.   In 1995, Defendant Guevara coerced Rodolfo Zaragoza, who was a victim and an eyewitness to a crime, into making a false identification and providing false testimony. Zaragosa was intimidated by Guevara and identified Ricardo Rodriguez as the offender because Guevara told him that Rodriguez was the shooter.

q.   In 1996, Defendant Guevara coerced Maria Rivera into making a false identification of a man in a lineup by unzipping his pants and propositioning her. Rivera later told the prosecutor that she had falsely identified an individual in a lineup at Guevara's direction. The prosecution later abandoned murder charges against the individual whom Rivera falsely identified in the lineup.

r.   In 1997, Defendant Guevara coerced Robert Ruiz into making a false identification. Guevara detained Ruiz repeatedly over the course of a ten-day period, locking him in an interrogation room without food, water, or a bathroom. Though Ruiz kept telling Guevara that he had not seen the shooter or the driver involved in the crime, Guevara told Ruiz whom to identify and what to say in his statement. Ruiz finally implicated Freddy and Concepcion Santiago in the murder because Ruiz believed that Guevara would continue to harass him until he changed his story. Ruiz recanted his identification at trial, and the judge found Freddy and Concepcion Santiago not guilty. The trial judge found it disturbing that Guevara was the lead detective in the case because the victim was Guevara's nephew.

s.   In 1995, Defendant Guevara engaged in misconduct when he told Jose Melendez to falsely identify Thomas Sierra as the shooter even though Melendez did not see the shooter. Melendez identified Sierra, but recanted his identification at trial.

t.   In 1988, Defendant Guevara used suggestive tactics to force twelve-year-old Orlando Lopez to falsely identify Jacques Rivera as the person who shot Felix Valentin. As a result, Rivera was convicted of murder. In 2011, Lopez testified at an evidentiary hearing that he had never been able to identify Rivera as the murderer. As a result, Rivera received a new trial. Ultimately, the State's Attorney dropped all charges against Rivera, who was granted a certificate of innocence.

u.   Also during the Felix Valentin shooting investigation, Defendant Guevara falsely claimed that the victim of that shooting identified Jacques Rivera as his shooter before he died. Defendant Guevara claimed that the identification was made at a time that the victim was in a medically-induced coma, unresponsive to any stimuli, and laying in a bed that was in constant motion to prevent his lungs from filling with fluid and killing him.

v.   In November 2001, Defendant Guevara's girlfriend, Judith Martinez, attended a trial in which Guevara was testifying and observed the testimony of trial witnesses. She then conferred with Guevara, even though the Court had ordered all witnesses excluded from the courtroom to prevent collusion among the witnesses.

w.   In 2011, the first district granted Tony Gonzalez a post-conviction hearing on the basis that Defendant Guevara conducted an unduly suggestive lineup wherein he concocted an array in which Gonzalez's photo was the only one that stood out from the rest in a photo array.

x.   In 1982, Defendant Guevara and another officer arrested and physically assaulted Annie Turner for smoking on a bus. Guevara called her a "bitch" and pushed her out the back

24

door of the bus. He twisted her arm, threatened to "snap" it, and handcuffed her so tightly that her skin broke. He also hit her across the face with a metal bracelet he was wearing and called her a "nigger bitch." Turner sought medical treatment and filed a complaint with the Office of Professional Standards.

   y. In 1982, Defendant Guevara and three other officers broke through Almarie Lloyd's locked front door and conducted a warrantless search of her home. When Lloyd asked who they were, she was told to shut up. The officers terrified Lloyd, her brother, and two children, and left the home in shambles. Lloyd filed a complaint with the Office of Professional Standards the next day.

   z. In 1983, Defendant Guevara and other officers forcibly removed Leshurn Hunt from his home and handcuffed him to a ring in the wall at the police station where he was beaten about the head, face, and body until he confessed to murder and robbery charges. Hunt was detained for approximately 23 hours and deprived of food, water, and sleep until after he confessed. Hunt sought medical treatment for his injuries and filed a complaint with the Office of Professional Standards. Witnesses who saw Hunt while in custody corroborated his claim of a beating by the police. The criminal court judge suppressed Hunt's confession, and a jury returned a favorable verdict in a related civil rights action on Hunt's claim of excessive detention against the City of Chicago.

   aa. In 1984, Defendant Guevara and other officers physically assaulted Graciela Flores and her 13-year old sister Anna during a search of their home, during which the officers did not identify themselves as police. Guevara repeatedly slapped Graciela, called her a "bitch" and pulled her hair. As a result of this incident, Graciela's arm was put in a sling and she spent one week in the hospital.

bb. In 1985, Defendant Guevara attempted to coerce a false statement from Reynaldo Munoz. Guevara handcuffed Munoz and put him in the back of a squad car. When Munoz denied knowing the people Guevara was asking about, Guevara repeatedly hit him in the mouth with his fist. Guevara then took Munoz to rival gang territory where he allowed rival gang members to spit on Munoz and beat Munoz about the head.

cc. In 1986, Defendant Guevara threw Rafael Garcia against a car, struck him in the face several times, kicked him and hit him in the head. Garcia filed a complaint with the Chicago Police Department's Office of Professional Standards (OPS). Although Guevara denied the charges, Garcia's complaints were corroborated by physical evidence, as he was treated at the hospital for lacerations to the head. After an investigation into the incident, OPS found that Guevara had lied about the incident and recommended that Guevara be suspended for two days.

dd. In 1986, Defendant Guevara and two other officers coerced a confession from Daniel Pena by beating him about the face and ribs with their hands and about the groin and thighs with flashlights during an interrogation. Pena was taken to see a doctor where he complained about being beaten by the police. The doctor found bruising to Pena's legs and abrasions and lacerations to Pena's nose. Family members corroborated Pena's claim that he had been beaten while in police custody.

ee. In 1986, Defendant Guevara pulled over Melvin Warren because Warren cut him off while driving westbound on Augusta Boulevard. Guevara called Warren a "nigger dog" and "threatened to tear [Warren's] head off." Guevara hit Warren in the face with a closed fist and then forced him down into the front seat of his car and began to choke him. Two eyewitnesses confirmed that Guevara initiated the beating. In response to this incident, Warren sought medical treatment and filed a complaint with the Office of Professional Standards (OPS). OPS sustained

Warren's allegations that Guevara had physically and verbally assaulted him and recommended that Guevara be reprimanded.

ff.  In 1989, Defendant Guevara coerced a false confession from Victor Vera by transporting him to rival gang territory and threatening to release him unless he confessed to the murder of Edwin Castaneda. Fearing for his life, Vera agreed to falsely confess to a crime he knew nothing about.

gg. In 1991, Defendant Guevara coerced David Rivera into signing a confession for murder by intimidation, threats, and inducements. Guevara told Rivera that if he confessed he would serve seven years in prison whereas if he did not confess, he would be sent away for fifty years. Guevara then promised Rivera that if he signed a statement, he could go home.

hh. In 1991, Defendant Guevara coerced a false confession from Daniel Rodriguez through the use of threats and intimidation. While en route to the police station, Guevara threatened to harm Rodriguez's family if he did not cooperate. Once at Area 5, Rodriguez was chained to a wall, denied food, water, and use of a restroom, and beaten by Guevara's partner, Defendant Halvorsen in the chest and torso. Guevara provided details of the crime to Rodriguez to include in Rodriguez's false confession.

ii.  In 1992, Defendant Guevara engaged in misconduct when he interrogated Jacqueline Montanez (no relation to Plaintiff) without a youth officer present. The appellate court reversed and remanded Ms. Montanez's conviction for murder, noting that "not only was defendant interrogated before having an opportunity to confer with a concerned adult, but, worse, any opportunity to do so was effectively frustrated by police."

jj.  In 1993, Defendant Guevara arrested fifteen year old Eliezar Cruzado and threatened him with life imprisonment if he did not make a statement implicating himself in a

27

murder. Guevara also told Cruzado that he could go home and see his family again, but only if he agreed to make a statement. At the time, Cruzado had a limited ability to read and write.

kk. In 1993, Defendant Guevara used physical force and threats to coerce a false confession from Adolfo Frias-Munoz. Over the course of a two-day interrogation, Frias-Munoz was handcuffed to a ring on the wall of the interrogation room, hit in the face with an open hand by Defendant Guevara, and beaten by two other officers. Though isolated in a locked interrogation room, Frias-Munoz could hear his wife screaming and his son crying in another room. Guevara threatened Frias-Munoz that if he did not confess, his wife would go to prison and his children would be taken away. Frias-Munoz, who did not speak English, agreed to give a statement to an assistant state's attorney. Frias-Munoz spoke in Spanish and Guevara translated the statement so that the prosecutor could write the statement in English. Frias-Munoz then signed a statement he could not read.

ll. In 1994, Defendant Guevara, after 14 hours of interrogation, coerced a confession from Adrian Duta by hitting him in the face with an open palm, punching him in the stomach, and telling him he could go home if he signed a statement. When Duta's father came to see Duta at the station house, Duta was exhausted and crying and repeatedly said that he did not know what he had signed and had only signed the document so he could go home. Duta complained to his father of being struck in the head and stomach by Guevara.

mm. In 1995, Defendants Guevara and Halvorsen coerced a confession from 17-year-old Santos Flores after handcuffing him to the wall of a locked interview room and refusing his requests for an attorney. During the course of the 11-hour interrogation, Guevara yelled at him, slapped him numerous times on the side of his head, and told him that if he did not confess he would never see the light of day. Flores eventually gave a statement to the police

28

indicating his involvement in the crime. Flores's statement was ruled inadmissible on appeal on the grounds that it was elicited in violation of Miranda.

nn. In 1997, Defendant Guevara coerced a false confession from Voytek Dembski by beating him while chained to a wall in a locked interrogation room. Dembski, a Polish National who did not speak English, was interrogated by Guevara without Miranda warnings, without notification to the Polish consulate, and without a Polish language interpreter. Dembski could not read the statement he eventually signed as it was written in English.

oo. In 1998, Defendant Guevara repeatedly hit Rosauro Mejia in an attempt to coerce a confession from him. Mejia never confessed and was finally released after being held in custody for three days.

pp. In 1998, Defendants Guevara repeatedly pulled Adriana Mejia's hair and struck here once on the back of her neck while she was interrogated.

qq. In 1998, Defendant Guevara repeatedly threatened and beat Arturo Reyes in order to coerce Reyes into giving an incriminating statement. After two days of isolation and interrogation, Reyes provided a false statement.

rr. In 1998, Defendant Guevara repeatedly struck Gabriel Solache on the left side of his head and in the stomach while Solache was chained to the wall of a locked interrogation room. After 40 hours of interrogation, Solache gave a false statement so that the beating would stop. Solache sought medical treatment and sustained permanent hearing loss to his left ear.

119. As set forth above, the City of Chicago failed to meaningfully discipline Defendants Guevara or other Defendants for their misconduct. The Police Officer Defendants engaged in the misconduct set forth in this Complaint because they knew that the City of Chicago and its Police Department tolerated and condoned such conduct.

**Plaintiff's Wrongful Conviction and Imprisonment**

120.    Ariel Gomez was charged with first-degree murder, as were the four other boys who had been in the Pathfinder that night. None of them pled to any crime.

121.    Plaintiff was tried in the Circuit Court of Cook County in August 1998. As a result of the Defendants' misconduct, described above, Plaintiff was convicted of first-degree murder. He was sentenced to 35 years in prison.

122.    Jose Dominguez, the person driving the Pathfinder when Plaintiff fired a single shot into the sky, was also convicted of first degree murder. However, in May 2001, Jose Dominguez's first-degree murder conviction was overturned based upon the fact that there was insufficient evidence to find that Plaintiff had killed Mr. Diaz.

123.    Tragically, Plaintiff remained in prison despite this fact,  a miscarriage of justice recognized by a federal judge from the United States District Court for the Northern District of Illinois, who  stated, "It is unjust that Mr. Gomez should sit in prison, convicted of murder, while his co-defendant should be cleared of it on the grounds that one cannot have accomplice liability if the principal—Mr. Gomez—is innocent."

124.    Without Plaintiff's false and coerced inculpatory statements, and Defendants' fabrication, manufacture, and suppression of evidence, Plaintiff never would have been arrested, prosecuted, or convicted.

125.    At no point in time between 1997 and the present day has there been any credible evidence giving rise to probable cause to suspect Plaintiff of the murder of Concepcion Diaz.

126.    Plaintiff was 17 years old when he was wrongly arrested. He spent almost all of the next 20 years of his life imprisoned for a crime he did not commit.

127. Plaintiff's whole life was turned upside down. His young adulthood was entirely consumed by the horror of his wrongful imprisonment.

128. Because of the Defendants' misconduct, Plaintiff was taken away from, and missed out on, the lives of his family and his friends. He returned home to relationships changed or lost by decades of wrongful incarceration.

129. Plaintiff was robbed of his young adulthood and his formative years; he was deprived of opportunities to gain an education, to engage in meaningful labor, to develop a career, and to pursue his interests and passions. Plaintiff has been deprived of all of the basic pleasures of human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being.

130. During his 20 years of wrongful imprisonment, Plaintiff was detained in harsh and dangerous conditions in prisons throughout Illinois.

131. Plaintiff never knew whether the truth would come out or whether he would ever be exonerated.

132. In addition to the severe trauma of wrongful imprisonment and Plaintiff's loss of liberty, the Defendants' misconduct continues to cause Plaintiff physical and psychological pain and suffering, humiliation, constant fear, nightmares, anxiety, depression, despair, and other physical and psychological effects. Plaintiff has been branded a murderer. He has suffered profound reputational harm as a result.

**Plaintiff's Exoneration**

133. Plaintiff fought hard to prove his innocence. Plaintiff continued to do so after being turned away time and again.

134.     On February 14, 2018, the date set for Plaintiff to present evidence of Guevara's misconduct and other evidence to the Court, the Cook County State's Attorney moved to vacate Plaintiff's murder conviction and dropped the murder charges against him.

135.     At the time of his exoneration, Plaintiff had been fighting the false charges against him for more than half of his life.

**COUNT I – 42 U.S.C. § 1983**
**False Confession**
**(Fifth and Fourteenth Amendments)**

136.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

137.     In the manner described more fully above, the Defendants, acting as investigators and without probable cause to suspect Plaintiff of the murder of Mr. Diaz, individually, jointly, and in conspiracy with one another, and others unknown, as well as under color of law and within the scope of their employment, forced Plaintiff to make false statements involuntarily and against his will, which incriminated him and which were used against him in criminal proceedings, in violation of his rights secured by the Fifth and Fourteenth Amendments.

138.     In addition, the Defendants, acting as investigators and without probable cause to suspect Plaintiff of the murder of Mr. Diaz, individually, jointly, and in conspiracy with one another, and others unknown, as well as under color of law and within the scope of their employment, used physical violence and extreme psychological coercion in order to force Plaintiff to incriminate himself falsely and against his will in a crime he had not committed, in violation of his right to due process secured by the Fourteenth Amendment. This misconduct was so severe as to shock the conscience, it was designed to injure Plaintiff, and it was not supported by any conceivable governmental interest.

139.    In addition, the Defendants, acting as investigators and without probable cause to suspect Plaintiff of the murder of Mr. Diaz, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, fabricated a false confession, which was attributed to Plaintiff and used against Plaintiff in his criminal proceedings, in violation of Plaintiff's right to a fair trial protected by the Fourteenth Amendment.

140.    Specifically, the Defendants conducted, participated in, encouraged, advised, and ordered an unconstitutional, hours-long interrogation of Plaintiff, using physical violence and psychological coercion, which overbore Plaintiff's will and resulted in him making involuntary and false statements implicating himself in the murder of Mr. Diaz.

141.    The false incriminating statements were wholly fabricated by the Defendants and attributed to Plaintiff.

142.    Those false statements were used against Plaintiff to his detriment throughout his criminal case. They were the reason that Plaintiff was prosecuted for and convicted of the Diaz murder.

143.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's innocence.

144.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages set forth above.

145.    The misconduct described in this Count by the Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

## COUNT II – 42 U.S.C. § 1983
### Due Process
### (Fourteenth Amendment)

146.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

147.    In the manner described more fully above, the Defendants, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial.

148.    In the manner described more fully above, the Defendants deliberately withheld exculpatory evidence from Plaintiff and from prosecutors, among others, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

149.    The Defendants also fabricated and manufactured evidence and solicited false evidence, fabricated police reports falsely implicating Plaintiff in the crime, obtained Plaintiff's conviction using that false evidence, and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff during his criminal case.

150.    In addition, the Defendants suppressed evidence that would have demonstrated Plaintiff's innocence.

151.    In addition, based upon information and belief, the Defendants concealed and fabricated additional evidence that is not yet known to Plaintiff.

152.    The Defendants' misconduct directly resulted in the unjust and wrongful criminal prosecution and conviction of Plaintiff and the deprivation of Plaintiff's liberty, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment.

153.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

154.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages set forth above.

155.    The misconduct described in this Count by the Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

**COUNT III – 42 U.S.C. § 1983**
**Deprivation of Liberty without Probable Cause**
**(Fourth and Fourteenth Amendments)**

156.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

157.    In the manner described more fully above, the Defendants, individual, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, used false evidence that they had manufactured in order to accuse Plaintiff of the Diaz murder, and to cause the institution and continuation of criminal proceedings against Plaintiff for that crime, without probable cause.

158.    In so doing, these Defendants caused Plaintiff to be deprived of his liberty without probable cause, in violation of his rights secured by the Fourth and Fourteenth Amendments.

159.    These Defendants initiated and continued judicial proceedings against Plaintiff maliciously, resulting in injury.

160.    The judicial proceedings against Plaintiff were terminated in his favor when the Cook County State's Attorney dismissed all charges against him.

161.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

162.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages set forth above.

163.    The misconduct described in this Count by the Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

**COUNT IV – 42 U.S.C. § 1983**
**Failure to Intervene**

164.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

165.    In the manner described above, during the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

166.    As result of the Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered injuries, including but not limited to loss of liberty, physical harm, and emotional distress. The Defendants had ample, reasonable opportunities to prevent this harm but failed to do so.

167.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

168.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages set forth above.

169.    The misconduct described in this Count by the Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

**COUNT V – 42 U.S.C. § 1983**
**Conspiracy to Deprive Constitutional Rights**

170.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

171.    The Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and thereby to deprive him of his constitutional rights, all as described in the various paragraphs of this Complaint.

172.    In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

173.    In furtherance of this conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

174.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

175.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages set forth above.

176.     The misconduct described in this Count by the Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VI.

## COUNT VI – 42 U.S.C. § 1983
### Policy and Practice Claim Against the City of Chicago

177.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

178.     As described more fully herein, the City of Chicago is liable for the violation of Plaintiff's constitutional rights by virtue of its official policies.

179.     Plaintiff's injuries were caused by the express policies, absence of needed express policies, and widespread practices and customs of the City of Chicago, as well as by the actions of policy-making officials for the City of Chicago.

180.     At all times relevant to the events described in this Complaint and for a period of time prior and subsequent thereto, the City of Chicago failed to promulgate proper or adequate rules, regulations, policies, and procedures for: the conduct of interrogations and questioning of criminal suspects by officers and agents of the Chicago Police Department and the City of Chicago; the collection, documentation, preservation, testing, and disclosure of evidence; writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; and maintenance of investigative files and disclosure of those files in criminal proceedings. In addition or alternatively, the City of Chicago failed to promulgate proper and adequate rules, regulations, policies, and procedures for the training and supervision of officers and agents of the Chicago Police Department and the City of Chicago, with respect to the conduct of interrogations and the techniques to be used when questioning criminal suspects, including juvenile suspects and witnesses.

181.    These failures to promulgate proper or adequate rules, regulations, policies, and procedures were committed by officers and agents of the Chicago Police Department and the City of Chicago, including the Defendants.

182.    In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City of Chicago had notice of a widespread practice and custom by officers and agents of the Chicago Police Department and the City of Chicago under which individuals suspected of criminal activity, such as Plaintiff, were routinely coerced against their will to involuntarily implicate themselves in crimes that they had not committed. It was common that suspects interrogated in connection with investigations within the jurisdiction of the Chicago Police Department and the City of Chicago falsely confessed, under extreme duress and after suffering abuse, to committing crimes to which they had no connection.

183.    Specifically, at all relevant times and for a period of time prior thereto, there existed a widespread practice and custom among officers, employees, and agents of the City of Chicago, under which criminal suspects were coerced to involuntarily implicate themselves by various means, including but not limited to one or more of the following: (1) individuals were subjected to unreasonably long and uninterrupted interrogations, often lasting for many hours and even days; (2) individuals were subjected to actual and threatened physical or psychological violence; (3) individuals were interrogated at length without proper protection of their constitutional right to remain silent; (4) individuals were forced to sign or assent to oral and written statements fabricated by the police; (5) officers and employees were permitted to lead or participate in interrogations without proper training and without knowledge of the safeguards necessary to ensure that individuals were not subjected to abusive conditions and did not confess involuntarily and/or falsely; and (6) supervisors with knowledge of permissible and

impermissible interrogation techniques did not properly supervise or discipline police officers and employees such that the coercive interrogations continued unchecked.

184.    In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City of Chicago had notice of widespread practices by officers and agents of the Chicago Police Department and the City of Chicago, which included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper investigative files, and/or did not disclose investigative materials to prosecutors and criminal defendants; (2) officers falsified statements and testimony of witnesses; (3) officers fabricated police reports and other false evidence implicating criminal defendants in criminal conduct; (4) officers failed to maintain and/or preserve evidence and/or destroyed evidence; and/or (5) pursued wrongful convictions through profoundly flawed investigations.

185.    These widespread practices, individually and/or together, were allowed to flourish because the leaders, supervisors, and policymakers of the City of Chicago directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees on proper interrogation techniques and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Plaintiff.

186.    The above widespread practices and customs, so well settled as to constitute *de facto* policies of the City of Chicago, were able to exist and thrive, individually and/or together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

187.    As a result of the policies and practices of the City of Chicago and the Chicago Police Department, numerous individuals have been wrongly convicted of crimes that they did not commit.

188.    In addition, the misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City of Chicago or were actually committed by persons with such final policymaking authority.

189.    Plaintiff's injuries were directly and proximately caused by officers, agents, and employees of the City of Chicago, including but not limited to the individually named Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

## COUNT VII – State Law Claim
### Malicious Prosecution

190.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

191.    In the manner described above, the Defendants, individually, jointly, or in conspiracy with one another, as well as within the scope of their employment, accused Plaintiff of the Diaz murder, and exerted influence to initiate and to continue and perpetuate judicial proceedings against Plaintiff for that crime, without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent.

192.    In so doing, these Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

41

193.    The judicial proceedings against Plaintiff were terminated in his favor when the Cook County State's Attorney dismissed all charges against him.

194.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and in total disregard of the truth and Plaintiff's clear innocence.

195.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VIII – State Law Claim
## Intentional Infliction of Emotional Distress

196.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

197.    The actions, omissions, and conduct of the Defendants, acting as investigators and as set forth above, were extreme and outrageous.

198.    These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

199.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered and continues to suffer emotional distress and other grievous and continuing injuries and damages set forth above.

## COUNT IX – State Law Claim
## Civil Conspiracy

200.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

201.    As described more fully in the preceding paragraphs, the Defendants, acting in concert with other known and unknown co-conspirators, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to

accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

202. The violations of Illinois law described in this complaint, including the Defendants' malicious prosecution of Plaintiff and their intentional infliction of emotional distress, were accomplished by Defendants' conspiracy.

203. The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

204. As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages set forth above.

**COUNT X – State Law Claim**
***Respondeat Superior***

205. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

206. In committing the acts alleged in the preceding paragraphs, the Defendants were employees of the City of Chicago and the Chicago Police Department, acting at all relevant times within the scope of their employment and under color of law.

207. Defendant City of Chicago is liable as principal for all torts committed by its agents.

**COUNT XI – State Law Claim**
**Indemnification**

208. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

209. Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

210.   The Defendants are or were employees of the Chicago Police Department, an agency of the City of Chicago, who acted within the scope of their employment in committing the misconduct described above.

211.   The City is liable to indemnify any compensatory judgment awarded against the Defendants.

WHEREFORE, Plaintiff ARIEL GOMEZ, respectfully requests that this Court enter a judgment in his favor and against Defendants REYNALDO GUEVARA, BERSCOTT RUIZ, ALAN PERGANDE, EDWARD MINGEY, ROBERT BIEBEL, UNKNOWN EMPLOYEES OF THE CITY OF CHICAGO, and the CITY OF CHICAGO, Illinois, awarding compensatory damages, attorneys' fees and costs against each Defendant, and, because they acted willfully, wantonly, and/or maliciously, punitive damages against each of the individual Defendants, and any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff, ARIEL GOMEZ, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

**ARIEL GOMEZ**

BY:   /s/ Anand Swaminathan
        *One of Plaintiff's Attorneys*

Jon Loevy
Anand Swaminathan
Steven Art
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
anand@loevy.com