IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| **Ariel Gomez**, <br><br> Plaintiff, <br><br> v. <br><br> **Reynaldo Guevara, Berscott Ruiz, Alan Pergande, Edward Mingey, Robert Biebel, Unknown Employees of the City of Chicago**, and **the City of Chicago**, Illinois, <br><br> Defendants. | No. 18 C 3335 <br><br> Hon. Charles P. Kocoras, District Judge <br><br><br><br> **Plaintiff's Motion to Compel *Monell* Discovery** |

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| THOMAS SIERRA, | ) |
|        Plaintiff, | ) No. 18 C 3029 |
| v. | ) Magistrate Judge M. David Weisman |
| REYNALDO GUEVARA, et al., | ) |
|        Defendants. | ) |

**ORDER**

This case is before the Court on plaintiff's motion to compel *Monell* discovery. For the reasons set forth below, the Court grants in part and denies in part the motion [138].

**Discussion**

Plaintiff spent twenty-two years in prison for a 1995 murder he did not commit. He alleges that the City had various practices that make it responsible under *Monell v. New York Department of Social Services*, 436 U.S. 658 (1978) for his wrongful arrest, conviction, and imprisonment. Specifically, plaintiff alleges that the City allowed officers to manipulate identification procedures and fabricate and suppress evidence and failed to provide them with adequate training, supervision, and discipline to ensure that their actions were constitutional. To prove these claims, plaintiff seeks: (1) the files of every homicide that was investigated in Chicago Police Department Area Five from 1989-95; and (2) every complaint register file ("CR") ever lodged against every detective who worked in Area Five from 1989-95.

**Homicide Files**

Plaintiff argues that the homicide files are relevant to all of his policy claims, as comparators to other CPD files and the files of the Cook County State's Attorney's Office ("CCSAO's), as fodder for expert analysis, and as a springboard for re-investigation of the cases to uncover other instances of unconstitutional conduct. Plaintiff says, for example, that the identification-manipulation, evidence-suppression, and failure-to-train claims may be proven by: (1) determining whether the homicide files "demonstrate non-compliance with policy and the absence of investigative materials;" (2) "compari[ng] . . . the homicide files to the CPD's permanent retention files, to demonstrate that the official version of an investigation included in the latter files was different than that included in the former" (Exs. Supp. Mot. Compel, Ex. A, Harjani Order, ECF 139-1 at 12); (3) comparing the homicide files to the corresponding files in the possession of the CCSAO; and (4) expert analysis of the identification rates evidenced by the files. As argued by plaintiff during the motion hearing, these means of proof can be accomplished through comparison of documents produced during various stages of the underlying criminal proceedings, and by expert analysis of the reported outcomes of the CPD investigations as compared to expected results based on academic and professional studies (*e.g.* the number of non-

identifications and (presumably) misidentifications reported by CPD compared to national studies, etc.). To prove a policy or practice led to the violation of plaintiff's rights, plaintiff must have access to enough other homicide investigations to demonstrate that any violation of his constitutional rights was part of a larger practice. Plaintiff has explained a means by which the requested information, despite the burdens of production, is sufficiently important for him to access and review in an effort to prove his case. The fact that plaintiff has no other ready means of gathering this type of information and his *Monell* claim raises questions that are important not only to him but to the public-at-large also justifies the burden involved in the discovery requested. In short, the importance of the information sought, the parties' relative access to the information sought, and the importance of the litigation as a whole justify the burden associated with the production of the homicide files (as narrowed *infra*). *See generally* Fed. R. Civ. P. 26(b)(1).

The City has no objection to plaintiff's comparing homicide files to CCSAO's files[1] or using them as a basis for expert analysis. However, it objects to plaintiff's stated plan to re-investigate the homicide cases to determine, for example, whether the CPD accurately recorded witness statements. The City argues that allowing plaintiff to re-investigate the homicide cases would be unduly burdensome and disproportionate to the needs of the case.[2]

The Court agrees. The City estimated in another case that there were 600 Area Five homicide files for the period 1992-98, and it would take the City eleven months to produce them. (*See* Pl.'s Resp., ECF 148 at 17.) Presumably, the number of files, and the time to produce them, for the seven-year period at issue here would be roughly the same. Once those files were produced, it would take plaintiff years to determine which cases to re-investigate, attempt to locate the relevant witnesses and police officers and interview or depose them, track down any defense files and obtain relevant hearing and trial transcripts for cases twenty to twenty-five years old. The information gathered through this proposed discovery would be compromised by the organic limitations of significantly elapsed time, failing memories, lost tangible items and witnesses, and the like. At the end of that process, plaintiff would supplement his Rule 26 disclosures with dozens of "witnesses" who plaintiff believes would support his *Monell* claim, and then the City would have to repeat the process to develop rebuttal evidence. And what would be the end result of this enormous investment of time and resources? The dubious recollections of witnesses to twenty-year-old events and the years-long postponement of plaintiff's day in court. Because the burden associated with this aspect of plaintiff's proposed discovery far outweighs the potential benefit of any discovery plaintiff might garner from re-investigating the crimes documented in the Area Five homicide files, the Court bars plaintiff from doing so.

---

[1] In fact, the City argues that it should only have to produce homicide files for which the CCSAO has a corresponding file because, the City says, the only way plaintiff can prove that it failed to produce exculpatory material is by comparing the homicide file to the CCSAO file. While that is one way plaintiff could try to prove this claim, he could also do so by showing, for example, that a homicide file does not match the CPD's permanent retention file or that materials are missing from a file that an expert would expect to see there. In short, because comparing homicide files to CCSAO files is not the only way plaintiff can prove his evidence-suppression claim, homicide file production will not be limited to cases in which the CCSAO has a corresponding file.

[2] The City does not seem to contest that the homicide files are relevant to plaintiff's evidence-suppression claim but contends that the claim is not viable because plaintiff has not identified any evidence that was not produced to him. This, however, is an argument on the merits of the case, which is not this Court's province. Alternatively, this argument could be viewed as a way to structure discovery, supporting a bifurcated discovery approach.

That leaves the issue of appropriate time frame for the homicide files to be produced for the purposes identified above. This case arises from a murder that occurred and was investigated in 1995. The Court is mindful that plaintiff's burden of proving a pattern or practice is a heavy one, and thus he will need the files for some extended period of time. *Pittman ex rel. Hamilton v. Cty. of Madison, Ill.*, 746 F.3d 766, 780 (7th Cir. 2014) ("[T]he fact that the jail experienced thirty-six suicide attempts and three successful suicides—standing alone—[is not proof] that the jail's policies are inadequate."); *Palmer v. Marion Cty.*, 327 F.3d 588, 596 (7th Cir. 2003) ("When a plaintiff chooses to challenge a municipality's unconstitutional policy by establishing a widespread practice, proof of isolated acts of misconduct will not suffice; a series of violations must be presented . . . ."). But plaintiff does not explain what, if anything, is significant about the period 1989-95 or why he or his experts need seven years of data as opposed to some lesser amount. (*See* Pl.'s Resp., ECF 148 at 12.) The Court believes production of five years of files, from 1991-95, strikes the right balance between plaintiff's need for the discovery and the burden production imposes on the City.[3]

**CR Files**

The City does not seem to dispute the relevance of the CR files to plaintiff's *Monell* claims but argues that it should only have to produce CRs for every fifth detective assigned to Area Five from 1992-95 because producing all CRs for all detectives who worked in Area Five during the period 1989-95, as plaintiff requests, would be unduly burdensome. The Court agrees that producing all CRs lodged at any time against every detective who worked in Area Five from 1989-95 would be unduly burdensome and not proportional to the needs of the case. But the City does not explain how it came up with the one-out-of-five approach or why that approach is reasonable.

Plaintiff might be amenable to the production of some kind of sample of CRs, if the City would stipulate that the sample "is representative of its policies and customs" (Mot. Compel, ECF 138 at 14), but the City refuses to do that. Given the City's failure to explain the genesis of its approach or agree that any sample it produces is representative, the sample approach is not viable. Moreover, as discussed at the motion hearing, the Court would be amenable to limiting production of CR's to those CR's related to the issues presented in this litigation, as opposed to *every* CR for every detective in Area 5. However, as explained by the City's counsel, the CPD does not categorize its CRs in a way that would enable it to identify CRs limited to the type of misconduct alleged in this matter. Thus, to effectively limit CR production to a more focused subset, the City would need to manually review each CR and determine whether or not the CR touches on alleged relevant misconduct. That review process would present a burden that the City is equally unwilling to accept. Thus, the Court is persuaded that wholesale production of a relevant timeframe of CRs from Area 5 Detective Division is appropriate.

---

[3] The Court is not persuaded that the *Monell* claims "add[] zero additional relief or monetary value to [plaintiff's] case." (City's Resp., ECF 147 at 11.) As plaintiff notes "success on th[e] *Monell* theory is possible without succeeding on other legal claims," or "the City might be found liable for violating constitutional rights while individual Defendants enjoy qualified immunity." (Pl.'s Resp., ECF 148 at 12.)

3

      As with the homicide files, the Court believes production of all CRs opened from 1991-95 against Area Five detectives strikes the right balance between plaintiff's need for *Monell* evidence and the burden production of that evidence imposes on the City.

**SO ORDERED.**                                         **ENTERED: December 3, 2019**

**M. David Weisman**
**United States Magistrate Judge**